UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

CLAUDIA ESTEVEZ-YELCIN, Individually and as
Parent and Natural Guardian of N.M., an infant and
J.M. an infant,

                                        Plaintiffs,

        -v-

THE CHILDREN'S VILLAGE, a not-for-profit
corporation,

                                        Defendant.

---

Case No. 01-CV-8784 (KMK)

<u>OPINION AND ORDER</u>

<u>Appearances</u>:

David Gilman, Esq.
Gilman & Schneider, Esqs.
New York, New York
*Counsel for Plaintiffs*

Christopher Simone, Esq.
Shaub, Ahmuty, Citrin & Spratt, LLP
Lake Success, New York
*Counsel for Defendant*

KENNETH M. KARAS, District Judge:

        This diversity action arises out of the alleged sexual abuse of two minor children, N.M.

and J.M., by Defendant Samuel Toffel ("Toffel").  The children's mother, Claudia Estevez-

Yalcin ("Estevez-Yalcin"), brought this action on behalf of herself and on behalf N.M. and J.M.

against Toffel, The Children's Village ("CV"), and Westchester County Health Care Corporation

("WCHCC").  Toffel was a volunteer at both WCHCC and CV at times when N.M. was a

patient/resident at each of the institutions.  Defendant CV moves for summary judgment.  For the

reasons stated herein, the motion is GRANTED.

A.  Procedural History

Defendant Toffel was named in multiple claims for relief.  Plaintiffs stated claims for relief sounding in sexual assault and battery, intentional infliction of emotional distress, breach of fiduciary duty, and losses sustained.  On January 31, 2002 a default judgment was entered against Defendant Toffel.  (Doc. No. 14)

WCHCC was named in the fifth claim for relief, which asserted that WCHCC and CV are liable, jointly and severally, for negligently hiring, retaining, and supervising Toffel.  CV also asserted a cross-claim against WCHCC for contribution or indemnity.  On October 16, 2003, Defendant WCHCC moved, pursuant to Federal Rule of Civil Procedure 56, for summary judgment on all claims pending against it.  (Doc. No. 47)  In an Opinion and Order dated August 11, 2004, Judge John G. Koeltl granted WCHCC's Motion for Summary Judgment dismissing all claims against it.  *See Estevez-Yalcin v. The Children's Village*, 331 F. Supp. 2d 170 (S.D.N.Y. 2004).  Because WCHCC was found not liable for the injuries suffered by Plaintiffs, Judge Koeltl also granted WCHCC summary judgment on CV's cross-claim for contribution or indemnity.  *Id.* at 179.

The Amended Complaint asserts multiple claims for relief against Defendant CV. Plaintiffs allege that CV is responsible for the torts committed by Defendant Toffel upon N.M. and J.M. through the theory of respondeat superior.  Plaintiffs also allege causes of action against CV for negligent hiring, retention, and supervision, breach of fiduciary duty, negligent infliction of emotional distress, and losses sustained.

On September 27, 2004 the case was reassigned to this Court.  (Doc. No. 57)  On July 14,

2005, CV moved pursuant to Federal Rule of Civil Procedure 56 for summary judgment on all claims pending against it. In the alternative, CV moved for partial summary judgment under Article 16 of New York's Civil Practice Law and Rules ("CPLR").

B. Facts

Unless otherwise noted, the following facts are undisputed. CV is a New York not-for-profit corporation located in Dobbs Ferry, New York, that provides residential treatment and rehabilitation programs for male juveniles with psychological difficulties. (CV's Rule 56.1 Statement ¶ 1; Pls.' Resp. 56.1 Statement ¶ 1) Plaintiffs N.M. and J.M. are brothers, born on December 15, 1985 and March 14, 1993, respectively. (CV's Rule 56.1 Statement ¶ 2; Pls.' Resp. 56.1 Statement ¶ 2) At the time WCHCC's Motion for Summary Judgment was filed, N.M. and J.M. lived in Florida, but both resided in New York when the majority of the alleged injuries occured. (WCHCC's Prior Rule 56.1 Statement ¶¶ 3, 6 (CV's Ex. C); Pls.' Prior Resp. 56.1 Statement ¶¶ 3, 6 (CV's Ex. C)) Plaintiff Estevez-Yalcin is the mother of N.M. and J.M. and currently resides in Florida with her son J.M. (CV's Rule 56.1 Statement ¶ 3; Pls.' Resp. 56.1 Statement ¶ 3)

From February 11, 1997 to June 30, 1997, N.M. was an in-patient in the pediatric ward at WCHCC's Psychiatric Institute. (CV's Rule 56.1 Statement ¶ 4; Pls.' Resp. 56.1 Statement ¶ 4) Defendant Toffel was a volunteer at WCHCC from approximately January 24, 1997 through the end of December 1997, during which time he met N.M. (CV's Rule 56.1 Statement ¶ 5; Pls.' Resp. 56.1 Statement ¶ 5) On June 26, 1997 Estevez-Yalcin signed a Voluntary Placement Agreement transferring care and custody of N.M. to the Commissioner of Social Services of the City of New York. (CV's Rule 56.1 Statement ¶ 6; Pls.' Resp. 56.1 Statement ¶ 6) N.M. was

discharged from WCHCC on June 30, 1997.  (CV's Rule 56.1 Statement ¶ 7; Pls.' Resp. 56.1

Statement ¶ 7 n.1)

From June 30, 1997 to August 27, 1998 and from October 29, 1998 to June 25, 1999,

N.M. was committed to CV.  (CV's Rule 56.1 Statement ¶ 8; Pls.' Resp. 56.1 Statement ¶ 8)

J.M. was never a patient at WCHCC or a resident of CV.  (CV's Rule 56.1 Statement ¶ 9; Pls.'

Resp. 56.1 Statement ¶ 9)  Toffel applied for a volunteer position at CV on approximately July 9,

1997.  (CV's Ex. L)  Toffel's application inquired whether he was requesting a specific boy to

mentor, and if so, which boy.  (CV's Ex. L)  Toffel checked yes to this question, naming N.M.,

and was ultimately assigned as N.M.'s volunteer mentor in approximately November 1997.

(CV's Ex. L)  Tragically, Toffel sexually molested N.M. during the period when N.M. was a

resident at CV and Toffel was his volunteer mentor.  (CV's Rule 56.1 Statement ¶ 10; Pls.' Resp.

56.1 Statement ¶ 10)  The abuse continued throughout N.M.'s stay at CV, often when N.M. went

for overnight visits to Toffel's apartment.  (WCHCC's Prior Rule 56.1 Statement ¶ 40; Pls.' Prior

Resp. 56.1 Statement ¶ 40; N.M. Dep. 81-83, 88, 91-96, 106-12 (CV's Ex. F))

During the time when N.M. was at CV, Toffel developed a relationship with Estevez-

Yalcin, through which he gained access to J.M.  (WCHCC's Prior Rule 56.1 Statement ¶ 43;

Pls.' Prior Resp. 56.1 Statement ¶ 43)  Toffel met J.M. a couple of months after N.M. was at CV

and subsequently sexually molested J.M., but it is unclear when the molestation of J.M. started.

(CV's Rule 56.1 Statement ¶ 10; Pls.' Resp. 56.1 Statement ¶ 10)  Although J.M. was never a

resident of CV, Plaintiffs allege that CV owed a duty to J.M. because CV provided therapeutic

services to J.M. in the form of group family therapy sessions both on campus and in his home.

(Pls.' Resp. 56.1 Statement ¶ 9; Tansey Dep. 46 (Pls.' Ex. A))  Additionally, Plaintiffs allege that

CV's duty to J.M. is established by the fact that a CV social worker suggested it would be a good idea for J.M. to stay with Toffel in his apartment because of problems J.M. was having at home. (Pls.' Resp. 56.1 Statement ¶ 9)  As a result, Plaintiffs allege, Toffel then arranged with CV and Estevez-Yalcin to take J.M. to Toffel's apartment.  (Pls.' Resp. 56.1 Statement ¶ 9)  There is no evidence in the record to suggest that the sexual molestation of J.M. occurred on CV premises. (CV's Rule 56.1 Statement ¶ 11; Pls.' Resp. 56.1 Statement ¶ 11)  CV contends that the molestation of N.M. also never occurred on CV premises.  (CV's Rule 56.1 Statement ¶ 11) However, Plaintiffs challenge this assertion by noting that N.M. testified he was sexually molested by Toffel while he was in Toffel's car in CV's parking lot.  (Pls.' Resp. 56.1 Statement ¶ 11; N.M. Dep. 94-95)

In 1997, Regis McDonald ("McDonald") was responsible for the hiring of mentors/volunteers at CV.  (CV's Rule 56.1 Statement ¶ 16; Pls.' Resp. 56.1 Statement ¶ 16) Before approving Toffel as a volunteer mentor, CV gathered the following information about and documentation from Toffel:  (a) name; (b) date of birth; (c) race/ethnicity; (d) place of residence; (e) residence and work telephone numbers; (f) information regarding his adoption of a Korean daughter through Family Services of Westchester (approximately twenty years earlier); (g) prior volunteer experience with children; (h) reasons for wanting to become a mentor; (i) results of a safety inspection of his home; (j) description of his home and housekeeping abilities; (k) information regarding his salary and employment; (l) mental, physical, and emotional health as well as any substance abuse; (m) observations of his personality; (n) family history/relations; (o) educational background; (p) military service; (q) marital status; (r) religious preference; (s) parental/disciplinary beliefs; (t) agreement to follow the Therapeutic Foster Care Program; (u)

completion of six sessions of "Parent Skills Training" in May 1997; (v) references providing personality and reliability assessments; (w) results of mandatory screening by the New York State Child Abuse Registry; (x) child care experience; (y) certification from the New York State Department of Social Services to board children; (z) certification of his home as Therapeutic Foster Home for Family Service of Westchester with the capacity of housing one respite child; (aa) CV's application for volunteer services; (bb) names, addresses, and telephone numbers of three references; (cc) Volunteer Home Assessment Form; (dd) New York State Central Registrar Clearance; and (ee) signed documentation that Toffel both read and understood the CV Mentor Handbook. (CV's Rule 56.1 Statement ¶ 17; Pls.' Resp. 56.1 Statement ¶ 17)[1]

Twelve to fourteen boys resided in each CV cottage and residents were not permitted to roam the CV facility unattended. (CV's Rule 56.1 Statement ¶ 18; Pls.' Resp. 56.1 Statement ¶ 18) Orientation and training of mentors included addressing the area of sexually inappropriate conduct with residents and the appropriate level of affection between a mentor and a resident.

---

[1] Plaintiffs do not dispute that CV gathered this background material before approving Toffel as N.M.'s volunteer mentor. (Pls.' Resp. 56.1 Statement ¶ 17) However, Plaintiffs contend that CV did not check Toffel's volunteer service references until after Toffel was arrested, and that there is no evidence to show that CV spoke with WCHCC about Toffel's volunteer service. (Pls.' Resp. 56.1 Statement ¶ 17) Plaintiffs also argue that CV sent N.M. on overnight visits with Toffel before receiving state clearances in violation of CV's stated policy. (Pls.' Resp. 56.1 Statement ¶¶ 17 n.2, 25) In support of this argument Plaintiffs note that CV only received state child abuse and fingerprint registry information clearing Toffel around February 23, 1998, yet allowed N.M. to go on overnight visits "well before that date." (Pls.' Resp. 56.1 Statement ¶ 25) However, Plaintiffs do not contest the fact that no "red flags" would have been raised even if CV followed its internal policy of not allowing overnight visits with mentors before receiving state clearances. Moreover, while CV arguably did not receive the requisite state clearances for Toffel before February 23, 1998, Plaintiffs do not explain why CV was not justified in relying on the New York State Registry Check conducted by the Family Services of Westchester on June 30, 1997 that was part of the background materials CV received before allowing Toffel to act as a mentor. (CV's Ex. L, Family Service of Westchester, Inc. Report 7)

(CV's Rule 56.1 Statement ¶ 20; Pls.' Resp. 56.1 Statement ¶ 20)  Further, mentors were provided with examples of giving direction to and oversight of a resident.  (CV's Rule 56.1 Statement ¶ 21; Pls.' Resp. 56.1 Statement ¶ 21)  This training included topics such as limit setting and over-involvement with the residents.  (CV's Rule 56.1 Statement ¶ 21; Pls.' Resp. 56.1 Statement ¶ 21)  Plaintiffs acknowledge that Toffel received such training but note that he clearly ignored it – a fact, they claim of which CV was aware, and about which CV articulated concerns yet did nothing to ameliorate.  (Pls.' Resp. 56.1 Statement ¶ 21)  However, the witness upon whose testimony Plaintiffs rely, N.M.'s social worker, Shannon Tansey ("Tansey"), noted that CV's concern was related to Estevez-Yalcin's relationship with Toffel and not Toffel's interaction with N.M.  (Tansey Dep. 37, 39, 46-47)  Moreover, CV addressed this concern by Tansey having a conversation with Estevez-Yalcin about boundaries.  (Tansey Dep. 39)

All new CV volunteer mentors began their interaction with residents by visiting with them on campus two to four times before they were allowed to take their residents off campus.[2] (CV's Rule 56.1 Statement ¶ 22; Pls.' Resp. 56.1 Statement ¶ 22; McDonald Dep. 162-63 (CV's Ex. O))  CV contends that the determination to allow off-campus visits is predicated on an assessment of on-campus visits.  (CV's Rule 56.1 Statement ¶ 23;  McDonald Dep. 163-64) Further, after off-campus visits, the child's social worker meets with the mentor and the resident to go over how the visit went.  (CV's Rule 56.1 Statement ¶ 23;  McDonald Dep. 163-64)

_____

[2]Plaintiffs do not dispute the statement that two to four on-campus visits between a resident and his mentor were required before allowing a mentor to take his mentee off campus. (Pls.' Resp. 56.1 Statement ¶ 22)  However, Plaintiffs claim that whether these on-campus visits occurred here cannot be corroborated by the record.  Yet, Plaintiffs also concede that Toffel did meet with N.M. at least two times on campus before any off-campus visit occurred.  (Pls.' Resp. 56.1 Statement ¶ 22 n.4)  This clearly corroborates that CV's general policy requiring at least two to four on-campus visits between residents and their mentors was followed in this case.

Plaintiffs claim that no one was present during N.M.'s two on-campus visits with Toffel that pre-date N.M.'s first off-campus visit with Toffel. (Pls.' Resp. 56.1 Statement ¶ 23) Further, N.M. testified that during his two on-campus visits, Toffel touched him on the shoulder and leg, and that no one asked him about these on-campus visits. (Pls.' Resp. 56.1 Statement ¶ 23) However, McDonald did not testify that a CV official is present during on-campus visits between a mentor and a resident. Rather, he testified that a mentor must first meet with his mentee on-campus two to four times, after which a determination is made by a social worker whether to allow the mentor to take the resident for off-campus visits. (McDonald Dep. 162-63) In fact, N.M. testified that at least one CV staff member spoke to N.M. before Toffel's first on-campus visit to tell N.M. that a man by the name of "Sam" would be visiting with him on-campus shortly. (N.M. Dep. 59-60 (CV's Ex. F)) N.M. also testified that a few weeks after his first on-campus meeting with Toffel, N.M. met with Tansey, Toffel, and CV's director where they told N.M. that Toffel was going to be his mentor. (N.M. Dep. 61-62) Although N.M.'s social worker met with him, at a minimum, on a weekly basis, (Tansey Dep. 8-9) Plaintiffs contend that N.M. was never asked about his visits with Toffel, nor whether he wanted to be Toffel's mentee or go on overnight visits with him. (Pls.' Resp. 56.1 Statement ¶ 23) Similarly, Plaintiffs note that although it may have been CV's policy to have a social worker speak with the mentor after each off-campus visit and transcribe the conversation into writing, no such transcriptions were discovered. (CV's Rule 56.1 Statement ¶¶ 23-24; Pls.' Resp. 56.1 Statement ¶ 23-24) Tansey testified that the only time she spoke with Toffel was at treatment conferences that occurred once every six months. (Pls.' Resp. 56.1 Statement ¶ 24; Tansey Dep. 27) However, N.M. never complained about any inappropriate behavior by Toffel to anyone at CV. (CV's Rule 56.1 Statement ¶ 36; Pls.' Resp.

56.1 Statement ¶ 36; N.M. Dep. 90)

CV permitted mentors to give inexpensive gifts to residents, but encouraged the gift-giving only to acknowledge good deeds or accomplishments.  (CV's Rule 56.1 Statement ¶ 29; Pls.' Resp. 56.1 Statement ¶ 29)  The rationale for this policy, as outlined in CV's Mentor Handbook, was to protect mentors from "falling into the trap of being Santa Claus to the [mentee]" and to emphasize that "the mentor relationship must not be established on the giving of gifts or things, but rather the giving of self, time, and friendship."  (CV's Ex. Q, The Children's Village Handbook 10)  In order to determine whether a gift was appropriate, CV considered the frequency of the gift-giving and the value of the gifts.  (CV's Rule 56.1 Statement ¶ 29; Pls.' Resp. 56.1 Statement ¶ 29)  Plaintiffs do not challenge that this was CV's stated policy regarding gifts, but note that CV made no such determination that the numerous gifts given to N.M. over the course of the time Toffel was his mentor were appropriate.  (Pls.' Resp. 56.1 Statement ¶ 29)  N.M. received a gift from Toffel every time he went on an overnight visit.  (Pls.' Resp. 56.1 Statement ¶ 29 n.6)  Indeed, many of these gifts were expensive, including such things as a Play Station, a gold chain, a Game Boy, $400 in cash (at one time), clothes and several pairs of new shoes.[3]  (Pls.' Resp. 56.1 Statement ¶ 29 n.6)

---

[3]CV argues that N.M. left the more expensive gifts from Toffel, the gifts that would be more likely to raise suspicion, at his mother's home.  (CV's Mem. of Law in Supp. of the Mot. for Summ. J. by Def. the Children's Village 13 ("CV's Mem."))  However, N.M. testified that he never took Toffel's gifts to his mother's home (N.M. Dep. 133) and that he left them at CV.  (N.M. Dep. 116)  Yet, N.M.'s mother testified that she knew about the numerous expensive gifts Toffel gave N.M. and that N.M. was very happy with receiving the gifts.  (Estevez-Yalcin Dep. 92, 98, 110-11 (CV's Ex. H))

CV also argues that Plaintiffs' evidence that CV staff knew of Toffel's gifts is speculative and vague.  (CV's Mem. 12-13)  However, N.M. testified that staff members mocked him about the gifts he received from Toffel (N.M. Dep. 83-85, 102, 115-16), and this evidence is corroborated by Dr. Esmeralda Coronado's affidavit where she states that upon returning N.M. to

CV maintains that CV residents and their families were encouraged to complain about staff members when necessary. (CV's Rule 56.1 Statement ¶ 30) However, Plaintiffs dispute this by noting that N.M. was discouraged from complaining about Toffel by CV staff who mocked his relationship with Toffel by saying that Toffel "was gay" and questioned why N.M. received "all of these presents." (Pls.' Resp. 56.1 Statement ¶ 30; N.M. Dep. 83-84) McDonald testified that he was unaware of anyone affiliated with CV ever voicing a suspicion of Toffel behaving inappropriately during off-campus visits. (CV's Rule 56.1 Statement ¶ 32)

Estevez-Yalcin visited Toffel's apartment and found nothing inappropriate about it. (CV's Rule 56.1 Statement ¶ 27; Pls.' Resp. 56.1 Statement ¶ 27) On numerous occasions following N.M.'s residency at CV, Toffel visited N.M.'s family in Florida. (CV's Rule 56.1 Statement ¶ 28; Pls.' Resp. 56.1 Statement ¶ 28) During one visit to N.M.'s family in Florida, Estevez-Yalcin knowingly allowed J.M. and her youngest son to sleep in the same bed with Toffel. (CV's Rule 56.1 Statement ¶ 28; Pls.' Resp. 56.1 Statement ¶ 28) On a separate occasion, when J.M. visited Toffel at his New York apartment, J.M.'s mother was not concerned when she learned that J.M. slept in the same bed with Toffel. (Estevez-Yalcin Dep. 138-39)

At no time during his residency at CV did N.M. ever report to anyone either from CV or otherwise about Toffel's sexual molestation. (CV's Rule 56.1 Statement ¶ 36; Pls.' Resp. 56.1 Statement ¶ 36; N.M. Dep. 90, 136) Nor did J.M. ever tell anyone about Toffel's sexual molestation of him during the time N.M. was a CV resident. (CV's Rule 56.1 Statement ¶ 37; Pls.' Resp. 56.1 Statement ¶ 37) CV contends that N.M. never complained to anyone at CV

---

CV one time, a CV employee greeted N.M. by mockingly saying, "here he comes with all his gifts and his friends again, showing off." (Coronado Aff. ¶¶ 23-24)

about going off-campus with Toffel, (CV's Rule 56.1 Statement ¶ 36) beyond asking why he "had to keep going every week." (N.M. Dep. 91; Pls.' Resp. 56.1 Statement ¶ 36)

In late 2000 or early 2001,[4] after N.M. left CV, Dr. Coronado, a physician and friend of the plaintiffs who had previously counseled N.M., (Coronado Aff. ¶ 1; N.M. Dep. 18-21; Estevez-Yalcin Dep. 46-47) and Estevez-Yalcin's boyfriend, confronted N.M. and J.M. with suspicions they had about Toffel's interaction with N.M. and J.M. (N.M. Dep. 146; Estevez-Yalcin Dep. 145-48) This was the first time N.M. or J.M. reported the abuse to anyone. (CV's Rule 56.1 Statement ¶ 38; Pls.' Resp. 56.1 Statement ¶ 38; N.M. Dep. 90, 136)

Subsequent to the events described above, Toffel pleaded guilty to an indictment charging him with sexually molesting N.M. during the period of time N.M. was committed to CV and to molesting J.M. after N.M.'s release from CV. (CV's Rule 56.1 Statement ¶ 12; Pls.' Resp. 56.1 Statement ¶ 12)

## II. Discussion

### A. Summary Judgment Standard

The standard for granting summary judgment is well established. Summary judgment is proper only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also*

---

[4]The parties disagree over when N.M. first told Dr. Coronado about the abuse. CV contends that this occurred in January 2001. (CV's Rule 56.1 Statement ¶ 38) Plaintiffs maintain this occurred in 2000. (Pls.' Resp. 56.1 Statement ¶ 38) The confusion over the date appears to stem from the fact that N.M. spoke to Dr. Coronado about the abuse sometime between Christmas 2000 (Coronado Aff. ¶ 37) and mid-January 2001. (Ex. R, Dobbs Ferry Police Department Complaint Report)

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-50 (1986).  In ruling on a motion for summary judgment, the court is "not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996) (citing *Liberty Lobby*, 477 U.S. at 255).  "As such, the non-movants – in this case, the plaintiffs – 'will have [their] allegations taken as true, and will receive the benefit of the doubt when [their] assertions conflict with those of the movant.'" *Dawson v. County of Westchester*, 373 F.3d 265, 272 (2d Cir. 2004) (quoting *Samuels v. Mockry*, 77 F.3d 34, 36 (2d Cir. 1996)).

"'The non-movant cannot escape summary judgment merely by vaguely asserting the existence of some unspecified disputed material facts, . . . or defeat the motion through mere speculation or conjecture.'" *Aetna Cas. & Sur. Co. v. Aniero Concrete Co., Inc.*, 404 F.3d 566, 574 (2d Cir. 2005) (quoting *Western World Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118, 121 (2d Cir. 1990)).  "While the party resisting summary judgment must show a dispute of fact, it must also be a material fact in light of the substantive law. 'Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Aetna Cas. & Sur. Co.*, 404 F.3d at 574 (quoting *Liberty Lobby*, 477 U.S. at 248). Thus, if there is a genuine dispute over a material fact "such that a reasonable jury could return a verdict for the nonmoving party," summary judgment must not be granted. *Liberty Lobby*, 477 U.S. at 248.

### B.  Negligent Hiring and Respondeat Superior

CV first moves for summary judgment on Plaintiffs' negligent hiring and respondeat

superior claims. Plaintiffs, in their response to CV's Motion for Summary Judgment, concede that they are unable to sustain their claims of negligent hiring and respondeat superior based on the record before the Court. (Pls.' Mem. of Law in Opp. to the Mot. for Summ. J. by Def. the Children's Village 4 ("Pls.' Resp.")) Accordingly, CV's Motion for Summary Judgment on the claims for negligent hiring and respondeat superior is granted.

### C. Negligent Supervision and Retention Claims

#### 1. N.M.

CV next moves for summary judgment on Plaintiffs' negligent retention and supervision claims. Plaintiffs claim that CV's alleged negligence in retaining and supervising Toffel renders CV liable for Toffel's sexual abuse of N.M. when he was a CV resident.

"To state a claim for negligent supervision or retention under New York Law, in addition to the standard elements of negligence, a plaintiff must show: (1) that the tort-feasor and the defendant were in an employee-employer relationship, (2) that the employer knew or should have known of the employee's propensity for the conduct which caused the injury prior to the injury's occurrence, and (3) that the tort was committed on the employer's premises or with the employer's chattels." *Ehrens v. Lutheran Church*, 385 F.3d 232, 235 (2d Cir. 2004) (citations and quotations omitted); *see also Estevez-Yalcin*, 331 F. Supp. 2d at 174 ("[A] necessary element of causes of action for negligent hiring, retention, and supervision 'is that the employer knew or should have known of the employee's propensity for the conduct which caused the injury.'" (quoting *Kenneth R. v. Roman Catholic Diocese of Brooklyn*, 654 N.Y.S.2d 791, 793 (App. Div. 1997) (collecting cases))). CV challenges Plaintiffs' ability to satisfy each of these three elements.

CV first argues that none of N.M.'s sexual abuse occurred on CV premises and therefore, the negligent supervision and retention claims should be dismissed. (CV's Mem. 11) However, Plaintiffs note that at least on one occasion Toffel rubbed N.M.'s shoulder and leg while on CV premises (Pls.' Resp. 10 (citing N.M. Dep. 61)), and N.M. testified that on another occasion Toffel sexually molested him in his car in CV's parking lot. (Pls.' Resp. 10 (citing N.M. Dep. 94-95)) In response, CV argues that N.M.'s "bald claim" that Toffel's car was on CV's campus "fails to raise any issue of fact that it was, in actuality, on CV premises," and thus Plaintiffs have "neglected to raise an issue of fact regarding whether any sexual abuse occurred on CV premises." (CV's Reply Mem. 8-9) Of course, CV misconstrues the summary judgment standard. N.M.'s testimony raises a very specific issue of material fact that is based on alleged personal knowledge and not mere speculation or conjecture. Moreover, CV offers no evidence to contradict N.M.'s recollection. Since this question of fact revolves around an assessment of N.M.'s credibility and reliability, it is not suitable for the Court to consider on a motion for summary judgment. *See McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) ("It is a settled rule that '[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment.'" (quoting *Fischl v. Armitage*, 128 F.3d 50, 55 (2d Cir. 1997))).

Next, CV asserts that Plaintiffs cannot establish that CV "'knew or should have known of [Toffel's] propensity for the conduct which caused the injury prior to the injury's occurrence.'" (CV's Mem. 11-12 (quoting *Ehrens*, 385 F.3d at 235)) Plaintiffs disagree and maintain that there is evidence in the record from which a reasonable jury could conclude that, in the least, CV should have known that Toffel was a sexual predator. Plaintiffs point to the following evidence

to support their claims: (1) Toffel was perceived to be a homosexual; (2) Toffel only expressed interest in mentoring boys between the ages eight and twelve; (3) N.M. started experiencing nightmares while at CV for the first time in his life; and (4) Toffel gave N.M. numerous expensive gifts that he brought back to the CV campus that caused other children to question why he got the gifts and caused at least one CV staff member to make comments about N.M.'s gifts. (Pls.' Resp. 6-10) CV challenges both the existence of these facts and whether, even if all these facts are true, the sufficiency of these facts to support a finding by a reasonable jury that Toffel's misconduct should therefore have been reasonably foreseeable to CV.

In a particularly unpersuasive argument, Plaintiffs suggest that CV staff comments about Toffel's perceived homosexuality is evidence from which a jury could reasonably conclude that CV should have known that Toffel was a pedophile. (Pls.' Resp. 6 (citing Tansey Dep. 30-31)) Toffel had no prior criminal record or history of sexual misconduct and had worked, without incident, with troubled children before his work at CV. Thus, vague rumors about Toffel's sexual orientation, given his apparently clean record, should not have raised any cautionary flags. Furthermore, assuming that Toffel was a homosexual, and CV knew or discovered Toffel's homosexuality, an assumption adopted only for the purposes of considering the sufficiency of CV's Motion for Summary Judgment, Toffel's molestation of N.M. cannot be characterized as a foreseeable consequence of Toffel's sexual orientation even under the most liberal reading of Plaintiffs' allegations. *See Doe v. British Univ. N. Am. Club*, 788 F. Supp. 1286, 1292 (D. Conn. 1992) (finding no cognizable duty where plaintiff offered "not one scintilla of credible evidence to suggest that homosexuals pose a greater risk of committing sexual molestation, assault, or criminal conduct than heterosexuals in a . . . camp environment").

Plaintiffs also contend that Toffel's evaluation by the Family Services of Westchester, Inc., noting that Toffel was "willing to accept a male child between the ages of 8 to 12" was evidence from which a jury could reasonably conclude that CV should have known, or at least formed a suspicion, that Toffel was a pedophile. (Pls.' Resp. 6-7 (citing CV's Ex. L)) However, this evaluation merely documented Toffel's willingness to work with boys between the ages of eight to twelve and therefore does not put a reasonable person on notice that Toffel posed a danger of sexual assault or battery of children. Moreover, as noted above, given the lack of any evidence that Toffel had, in fact, engaged in any past improper conduct with children further undercuts Plaintiffs' claim.

Plaintiffs next suggest that CV should have known of the abuse due to N.M's nightmares and sleepwalking, something they contend was witnessed by CV staff members and documented by CV. (Pls.' Resp. 7-8) There is some evidence in the record that at least N.M.'s social worker knew that N.M was experiencing nightmares while at CV and took precautions to put N.M. on a lower bunk-bed so that he would not hurt himself if he sleepwalked. (Tansey Dep. 18-19) However, as Plaintiffs concede, there are no details about the contents of the nightmares in the record. (Pls.' Resp. 8) The record is also clear that N.M.'s nightmares started before N.M.'s interaction with Toffel as N.M.'s mother testified that N.M. would wake up nervous after experiencing nightmares well-before he went to CV. (Estevez-Yalcin Dep. 46) Plaintiffs attempt to counter this evidentiary deficiency by pointing to Dr. Coronado's first-hand observations of N.M.'s nightmares and statements N.M. made in the throes of his nightmares while sleeping over at Dr. Coronado's home shortly before N.M. left CV. (Coronado Aff. ¶¶ 8-10) However, Dr. Coronado did not tell anyone at CV about the nightmares nor did she relay any

concern about the nightmares to anyone at CV. Thus, her independent observations of N.M.'s nightmares could not have, and did not, put CV on notice of any changes to N.M.'s behavior, nor does her affidavit establish that N.M.'s nightmares began while he was at CV. Furthermore, based on the record before the Court it is not reasonable to infer that N.M. experienced nightmares as a result of anything that happened while N.M. was at CV or that the particular statements N.M. made while he was observed by Dr. Coronado also occurred while N.M. was at CV. As a result, no reasonable juror could conclude that N.M.'s nightmares were sufficient to put CV on notice that N.M. was potentially being sexually abused by Toffel.

Finally, Plaintiffs contend that CV was sufficiently on notice of Toffel's dangerous propensities due to the numerous expensive gifts N.M. received from Toffel that raised the attention of both CV residents and at least one CV staff member, and that were out of line with CV's policy regarding gifts. According to CV, its policy for gifts is to allow mentors to give residents appropriate and inexpensive gifts to acknowledge good deeds or accomplishments. (CV's Rule 56.1 Statement ¶ 29; McDonald Dep. 69-74, 169) CV also required the gifts to be discussed ahead of time and agreed upon by the social worker and the director of the program. (McDonald Dep. 72, 169) CV would become aware of any problems with the gift policy by having its staff members inspect the personal areas of the children in the CV cottages, or through CV's social workers listening to the children making reference to gifts. (McDonald Dep. 170-71) If CV became aware that mentors did not discuss in advance with the social worker why a gift was being given, or if the frequency of gift-giving or the value of gifts became excessive, CV would direct the mentor to stop this behavior. (McDonald Dep. 169-70) The undisputed reason for this policy was to protect mentors from "falling into the trap of being Santa Claus to the

[mentee]" and to emphasize that "the mentor relationship must not be established on the giving of gifts or things, but rather the giving of self, time, and friendship." (CV's Ex. Q, The Children's Village Handbook 10)

Plaintiffs maintain that N.M. received a gift from Toffel every time he went on an overnight visit. (Pls.' Resp. 56.1 Statement ¶ 29 n.6) Many of these gifts were expensive, including such things as a Play Station, a gold chain, a Game Boy, $400 in cash (which N.M. used to buy clothes before returning to CV), clothes, and several pairs of new shoes. (Pls.' Resp. 56.1 Statement ¶ 29 n.6; N.M. Dep. 81, 83, 90-91, 101, 112-13, 115-16) CV maintains that it could not have reasonably discovered the more inappropriate gifts because N.M. left the more expensive gifts from Toffel, the gifts that would be more likely to raise suspicion, at his mother's home. (CV's Mem. 13 (citing N.M. Dep. 133)) However, a reasonable juror could conclude that CV knew of the gifts Toffel gave N.M. because he left his gifts at CV (N.M. Dep. 116), and at least on staff member mocked him about the gifts he received from Toffel. (N.M. Dep. 83-85, 102, 115-16) Furthermore, Estevez-Yalcin also testified that on one occasion she spoke with N.M.'s "cottage supervisor" at CV about Toffel's gifts and was told that gift giving was normal. (Estevez-Yalcin Dep. 94)

Under New York law, which defendants contend, and which Plaintiffs do not dispute, applies in this case, it is well established that schools or other institutions charged with the care of children are subject to a higher standard of care than ordinary negligence. The seminal case on the issue explains, "a teacher owes it to his charges to exercise such care of them as a parent of ordinary prudence would observe in comparable circumstances." *Hoose v. Drumm*, 22 N.E.2d

233, 234 (N.Y. 1939); *accord Mirand v. City of New York*, 637 N.E.2d 263, 266 (N.Y. 1994).[5]

This "duty owed derives from the simple fact that a school, in assuming physical custody and control over its students, effectively takes the place of parents and guardians." *Mirand*, 637 N.E.2d at 266 (citation omitted). This duty has further been described as a "special duty" that "requires a school to act when a child, [w]hile in its charge, is threatened by the negligence of a third party, and it must make reasonable efforts to anticipate such threats." *Pratt v. Robinson*, 349 N.E.2d 849, 852 (N.Y. 1976) (citation omitted). "The standard for determining whether this duty was breached is whether a parent of ordinary prudence placed in the identical situation and armed with the same information would invariably have provided greater supervision." *Mary KK v. Jack LL*, 611 N.Y.S.2d 347, 349 (App. Div. 1994) (citation omitted); *see also Murray v. Research Found. of State Univ. of NY*, 723 N.Y.S.2d 805, 807 (App. Div. 2001). In other words, applying the heightened duty, in order for liability to ensue against CV, the harm allegedly incurred by N.M. must have been reasonably foreseeable to a parent of ordinary prudence. *See Estevez-Yalcin*, 331 F. Supp. 2d at 176.

It is undisputed that CV assumed physical custody and control over its resident children, including N.M., in a similar fashion to that of a school. Thus, CV effectively took the place of parents and guardians and assumed the duty to exercise the same care and supervision over its charges. It is also undisputed that CV maintained a policy outlining that mentors could give their mentees gifts on a limited basis for particular achievements, that gifts should be moderate in value, and that this policy was intended to protect mentors from being perceived by mentees as

---

[5]Plaintiffs also explicitly adopt the standard of care as being that of what a parent of ordinary prudence would do in comparable circumstances. (Pls.' Resp. 16 (citing *Rodriguez v. 1201 Realty LLC*, 781 N.Y.S.2d 328, 330 (App. Div. 2004)))

merely gift-givers.  This rationale behind the policy is supported by the fact that if CV became aware of inappropriate gift-giving by mentors it would tell the mentor that "this is something [CV] would not permit," and talk to the child about it.  (McDonald Dep. 170-71)

Assuming CV staff knew both of the number and expense of the gifts N.M. received from Toffel, a fact that N.M.'s mother knew about, Toffel's molestation of N.M. cannot be characterized as a reasonably foreseeable consequence of this gift-giving.  *See Steinborn v. Himmel*, 780 N.Y.S.2d 412, 415-16 (App. Div. 2004) ("Even assuming defendants were aware of [the volunteer scoutmaster's] alleged improper use of alcohol and cigarettes," in providing alcohol to the underage plaintiffs and drinking beer and smoking cigarettes in front of the plaintiffs, "we find these allegations, although relevant to [the alleged molestor's] qualifications as a scout leader, insufficient as a matter of law to constitute notice to defendants that there was a danger of [the scoutmaster] sexually assaulting plaintiffs." (citations omitted)); *see also Wilson v. Diocese of N.Y. of Episcopal Church*, No. 96 Civ. 2400, 1998 WL 82921, at *4 (S.D.N.Y. Feb. 26, 1998) ("In this case, the evidence establishes that neither [of the employer] Defendants knew or should have known of any alleged propensity on [the employee's] part to commit sexual assault both prior to hiring him and throughout the period of his employment."); *Lisa P. v. Attica Cent. Sch. Dist.*, 810 N.Y.S.2d 772, 773 (App. Div. 2006) (holding, in light of the lack of evidence of any prior inappropriate conduct by the molester, defendant's actual or constructive notice that on several overnight school trips the teacher who molested two twelve-year-olds slept in a room with the plaintiff's children "does not establish the requisite knowledge or notice of [the teacher's] propensity or likelihood to engage in sexually abusive behavior").  Toffel had no documented history of child molestation, sexual deviancy, or criminal conduct.  To the contrary,

among other things, Toffel had prior positive volunteer experience with children, certification from both the New York State Department of Social Services and the Family Service of Westchester to board a child, and was recommended to CV by three positive references. Moreover, in light of the fact that CV's gift-giving policy was intended to protect mentors from being seen as merely gift-givers, Toffel's gifts, while potentially exorbitant, might only alert CV that Toffel was potentially being taken advantage of for his gifts and not that he was sexually abusing N.M. Thus, the Court concludes, a reasonable jury could not conclude based on the record in this case that CV knew or should have known facts that would lead a reasonable person to suspect Toffel posed a risk to children.[6] Accordingly, summary judgment should be granted in favor of CV on Plaintiffs' negligent retention and supervision claim as to N.M.

CV also moves for summary judgment for torts committed by Toffel against N.M. that occurred after N.M. left CV and was in the custody of his mother. CV argues that the sexual abuse committed by Toffel that occurred while N.M. was in his mother's custody was not proximately caused by any negligent retention or supervision by CV. (CV's Mem. 18) Since the

---

[6]CV also suggests that Toffel's status as a volunteer mentor does not give rise to the requisite "employer-employee" relationship set forth in *Ehrens*. (CV's Mem. 11) Under New York law, "[n]egligent . . . retention concepts do have sufficient flexibility to cover relationships which are not those of a typical employer-employee arrangement, especially where a named defendant is alleged to have selected or controlled persons placed in contact with minors." *Sheila C. ex rel. Doe v. Povich*, 768 N.Y.S.2d 571, 580 (Sup. Ct. 2003), *aff'd as modified*, 781 N.Y.S.2d 342 (App. Div. 2004). Thus, in the context of CV assuming physical custody over children, even if CV held Toffel out to be a volunteer, a point Plaintiffs challenge, (Pls.' Resp. 5) Toffel's relationship with CV appears sufficient to maintain a negligent supervision and retention claim. However, because the Court finds that no reasonable jury could conclude based on the record in this case that CV knew or should have known facts that would lead a reasonable person to suspect that Toffel posed a risk to children, the question of Toffel's status as a volunteer is an issue the Court need not ultimately reach. *Cf. Koran I. v. New York City Bd. of Educ.*, 683 N.Y.S.2d 228, 230 (App. Div. 1998) (school volunteer screened by teachers and principal, claim dismissed only upon proof defeating substantive claim).

Court concludes that no reasonable juror could find CV knew or should have known of N.M.'s abuse at the hands of Toffel while N.M. was in CV's custody, it also finds that N.M.'s abuse after leaving CV's custody could not have been proximately caused by any negligence in its retention or supervision of Toffel. Moreover, the intervening independent acts of N.M.'s mother and Toffel, as well as the separation in time and place, between N.M.'s abuse while in the custody of CV and after he left CV, make Toffel's abuse of N.M. following N.M.'s departure from CV outside of the scope of Toffel's employment with CV. *See Estevez-Yalcin*, 331 F. Supp. 2d at 177 (citations omitted). Accordingly, Defendant CV's Motion for Summary Judgment for negligent retention and supervision pertaining to N.M. is granted in full.

### 2. J.M.

CV also moves for summary judgment of the claims for negligent retention and supervision for the injuries suffered by J.M. CV asserts that Toffel's abuse of J.M. was too attenuated from his volunteer work at CV to hold CV liable. (CV's Mem. 17-18) In addition, CV asserts that it did not owe J.M. a duty of care and therefore no tort could follow. (CV's Mem. 18-21)

J.M. had some interaction with CV as a result of participating in family therapy sessions with N.M.'s social worker both on CV's campus and at visits by the social worker to N.M.'s home. (Tansey Dep. 46) Additionally, Plaintiffs allege that it was a social worker at CV who suggested it would be a good idea for J.M. to stay at Toffel's apartment because of problems J.M. was having at home. (Pls.' Resp. 56.1 Statement ¶ 9 (citing N.M. Dep. 123-24)) N.M. testified that when he and J.M. slept at Toffel's apartment their mother was always there, (N.M. Dep. 124) however, Estevez-Yalcin testified that J.M. stayed overnight at Toffel's apartment without

her or N.M. (Estevez-Yalcin Dep. 135-36) Nevertheless, Estevez-Yalcin also acknowledged that J.M. told her that he slept in the same bed with Toffel, but after discussing this with Toffel she was not troubled by it. (Estevez-Yalcin Dep. 138-39)

The existence and scope of an alleged tortfeasor's duty is a matter of law to be determined by the Court. *See Palka v. Servicemaster Mgmt. Servs. Corp.*, 634 N.E.2d 189, 192 (N.Y. 1994) Under New York law, because the duty of a child's custodian is "coextensive with and concomitant to its physical custody of and control over the child" the duty of a temporary custodian of a child ceases when "the child has passed out of the orbit of [the custodian's] authority in such a way that the parent is perfectly free to reassume control over the child's protection . . . ." *Pratt*, 349 N.E.2d at 852; *see also Sheila C. v. Povich*, 781 N.Y.S.2d 342, 348-49 (App. Div. 2004) (collecting cases). Here, Plaintiffs admit that J.M. was never a resident of CV, (Pls.' Resp. 56.1 Statement ¶ 9) nor is there evidence alleged to show that J.M was in the custody of CV when he was allegedly molested by Toffel. Since J.M. was never in the physical custody or control of C.V. and J.M.'s parents had control over him and were supervising him at the time Toffel contacted J.M., and J.M.'s mother knew and approved of J.M. sleeping in the same bed as Toffel (a fact not alleged to have been known by CV), none of the incidents that befell J.M. were within CV's orbit of duty. *See Povich*, 781 N.Y.S.2d at 349-50; *Anonymous v. Dobbs Ferry Union Free Sch. Dist.*, 736 N.Y.S.2d 117 (App. Div. 2002) (citations omitted) (holding nexus between defendant's employment and alleged sexual molestation of plaintiff children "severed by time, distance, and the intervening independent actions of their parents"). Accordingly, CV's Motion for Summary Judgment for negligent retention and supervision pertaining to J.M. is granted.

<u>     D.  Breach of Fiduciary Duty</u>

<u>     </u>Plaintiffs allege that by reason of the nature of the special relationship between N.M. and CV, CV had a fiduciary duty to create and sustain an atmosphere in which N.M. felt safe and able to reveal to CV staff that he had been sexually molested.  (Pls.' Am. Compl. ¶ 100)  CV's failure to create and sustain such an environment, Plaintiffs allege, was the proximate cause of N.M.'s continued injury.  (Pls.' Am. Compl. ¶ 101)  However, at oral argument Plaintiffs conceded that their breach of fiduciary claims were based upon the same set of facts and theories as their negligence claims and therefore dismissal of their negligence claims would necessarily warrant dismissal of their breach of fiduciary duty claims.  (Hr'g. Tr. 43-44, May 18, 2006)

"In order to prevail on the tort claim of breach of fiduciary duty, a plaintiff must prove: (1) a fiduciary duty existing between the parties; (2) the defendant's breach of that duty; and (3) damages suffered by the plaintiff which were proximately caused by the breach."  *Metro. W. Asset Mgmt., LLC v. Magnus Funding, Ltd.*, No. 03 Civ. 5539, 2004 WL 1444868, at *8 (S.D.N.Y. June 25, 2004)  Even assuming that Plaintiffs have proffered sufficient evidence to create a material issue of fact as to whether a fiduciary relationship existed between CV and Plaintiffs, there is insufficient evidence to support a finding by a reasonable jury that CV breached such a duty to Plaintiffs.  For the reasons stated *supra*, the Court finds that a reasonable jury could not conclude based on the record in this case that CV knew or should have known facts that would lead a reasonable person to suspect that Toffel posed a risk to children. Furthermore, there is insufficient evidence in the record for a reasonable jury to conclude that without such knowledge CV acted in breach of its duties to Plaintiffs.  Accordingly, Defendant CV's Motion for Summary Judgment on the breach of fiduciary duty claims as to all Plaintiffs is

granted.

<u>      E.  Negligent Infliction of Emotional Distress</u>

      Defendant CV also moves for summary judgment on Plaintiffs' claim for negligent infliction of emotional distress.  CV argues that since Plaintiffs' claims for negligent supervision and retention are inadequate, their claim for negligent infliction of emotional distress must also fail.  (CV's Mem. 22)

      Negligent infliction of emotional distress claims "generally must be premised on conduct that unreasonably endangers the plaintiff's physical safety or causes the plaintiff to fear for his or her physical safety." *Lipton v. Unumprovident Corp.*, 783 N.Y.S.2d 601, 603-04 (App. Div. 2004) (collecting cases); *see also Bouchard v. New York Archdiocese*, No. 04 Civ. 9978, 2006 WL 1375232, at *5 (S.D.N.Y. May 18, 2006).  "Moreover, a cause of action for either intentional or negligent infliction of emotional distress must be supported by allegations of conduct by the defendants 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Povich*, 781 N.Y.S.2d at 351 (quoting *Murphy v. Am. Home Prods. Corp.*, 448 N.E.2d 86, 90 (N.Y. 1983)).  Reading the evidence in the light most favorable to Plaintiffs, while the Court finds Toffel's conduct obviously outrageous, Plaintiffs' allegations as to CV do not rise to the level of conduct necessary to sustain such a cause of action.  CV's failure to interpret Toffel's seemingly normal behavior as a signal that he was a pedophile cannot be considered by a reasonable jury as conduct that is atrocious, particularly given the lack of any cause for concern in light of Toffel's positive references.  Similarly, Plaintiffs' argument that CV did not create an environment for N.M. where he felt comfortable in telling someone that he was being molested is

belied by the fact that N.M. told Dr. Coronado, a person around whom he felt comfortable, (N.M. Dep. 21) about the molestation only after she confronted him with her suspicions after N.M. left CV. (N.M. Dep. 145-46) Further, Coronado's suspicions, as well as those of Estevez-Yalcin's boyfriend, were based on things, including N.M.'s interaction with his siblings and Coronado's children, that they personally observed outside of CV's custody of N.M. (Coronado Aff. ¶¶ 27-49) There is also no evidence in the record that anyone at CV observed, or should have been able to observe, Toffel's horrific behavior while N.M. was at CV. Accordingly, Defendant CV's Motion for Summary Judgment on the negligent infliction of emotional distress claim is granted.

### F. NY CPLR Article 16 and Losses Sustained

Should Plaintiffs' claims survive summary judgment, Defendant CV argues that partial summary judgment, pursuant to Article 16 of New York's CPLR, should be granted because Toffel must, as a matter of law, bear more than 50% of the total liability. (CV's Mem. 23) Because the Court grants CV's Motion for Summary Judgment on all claims, the question of CV's potential joint and several liability under Article 16 is necessarily moot. For the same reason, Defendant CV's Motion for Summary Judgment of Plaintiffs' claim for losses sustained as a result of CV's alleged breach of duty and negligence is also granted.

## III. Conclusion

For the foregoing reasons, Defendant CV's Motion for Summary Judgment is

GRANTED in its entirety and the Amended Complaint is hereby dismissed as to CV. The Clerk

of the Court is directed to enter judgment in Defendant CV's favor and close this case.

SO ORDERED.

Dated:     June 4, 2006
            New York, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

Service List:

David Gilman, Esq.
Gilman & Schneider, Esqs.
140 Broadway, 46th Floor
New York, New York 10005
*Counsel for Plaintiffs*

Christopher Simone, Esq.
Shaub, Ahmuty, Citrin & Spratt, LLP
1983 Marcus Avenue
Lake Success, New York 11042
*Counsel for Defendant*